IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS & ST. JOHN
Case No. 3:19-CR-0008

UNITED STATES OF AMERICA,
Plaintiff/Respondent

v.

DAVID WIKEL,
Defendant/Petitioner

_____/

*Emergency Motion for Modification of Sentence Pursuant*
*To the Cares Act of 2020*

Comes Now, the defendant/Petitioner, David Wikel, pro-se, Pursuant to 18 U.S.C. Section 3582(c)(1)(A), interposing Haines v. Kerner, 404 U.S. 519 (1972), who respectfully moves this Honorable Court for a modification of his sentence under the Cares Act of 2020, to be placed in Home Confinement for the remainder of his sentence or until such time as the danger associated with the wide spread of the COVID-19 has dissipated within the Federal Bureau of Prisons. In support thereof, Petitioner avers as follows:

COVID-19, poses a grave threat to the life of Mr. Wikel due to his compromised immune system and underlying heath conditions. Mr. Wikel suffers from High Blood Pressure and Hypertension for which he is taking medications..

BOP data indicate that COVID-19 has become widespread in the federal prison system. The BOP has 141,310 federal inmates in BOP-managed institutions and 10,823 in community-based facilities. The BOP staff complement is approximately 36,000. As of 05/04/2020, there are 1984 federal inmates and 356 BOP staff who have confirmed positive test results for COVID-19nationwide. Currently, 543 inmates and 149 staff have recovered. There have been 40 federal inmate deaths and 0 BOP staff member deaths attributed to COVID-19 disease.

COVID-19 and the Prison Environment According to the Vera Institute of Justice, "it is not a matter of if, but when, coronavirus shows up in courts, jails, detention centers, prisons, and other places where the work of the criminal and immigration systems occur." While prisons may appear to be closed environments, because prisoners cannot leave and return to the facility on their own volition, there are opportunities for the disease to be introduced into any prison. COVID-19 has be introduced by the prison's staff, who could be exposed when they are not at the prison and subsequently introduce it to the facility when they come to work. COVID-19 could also be transmitted to a prisoner though face-to-face visits with family, friends, or attorneys. Also, while prisoners cannot freely leave the facility, they do travel outside it for things such as court appearances or medical appointments.15       The introduction of COVID-19 into a prison raises the concern that the nature of the prison environment can facilitate its spread. Prisons typically hold hundreds of prisoners who live in close proximity to one another. In some facilities, prisoners might live in dormitory-style housing where many share the same space. Even if prisoners are housed in individual cells, they typically share the same ventilation system with prisoners in other cells. There are also concerns about hygiene. Prisoners might not have regular access to soap and water to wash their hands, and hand sanitizer can be considered contraband because it contains alcohol. These concerns are especially acute for prison systems that are operating over capacity.

There are also concerns about whether prisoners will have access to adequate medical care if a prison's staff is hit hard by the disease. If COVID-19 were to spread among prison staff resulting in wide spread quarantines, there could be fewer medical staff to deliver care or fewer correctional staff available to transport critically ill prisoners to outside medical facilities. Also, prison infirmaries tend to have fewer medical resources, such as isolation beds, compared to hospitals. However, one expert at the National Commission on Correctional Health Care believes that the prisons are prepared to handle potential COVID-19 infections because prisons have experience

with preventing the spread of communicable diseases. As of April 16, 2020, BOP has approximately 172,300 prisoners under its jurisdiction, who are held in a combination of BOP-operated facilities (122 in total), privately operated prisons, Residential Reentry Centers (RRCs; i.e., halfway houses), and state prisons. While the federal prison population decreased by approximately 42,000 prisoners (19%) from FY2013 to FY2019, the federal prison system operated at 12% over its rated capacity in FY2019. According to USMS, in FY2019 they received approximately 248,900 prisoners and their average daily detention population was approximately 61,500 prisoners. While BOP does not publish data on the number of prisoners that have health conditions that might make them more susceptible to serious complications if they were to contract COVID-19, as of April 18, 2020, approximately 10,200 prisoners (6% of all prisoners) under BOP's jurisdiction were age 61 or older. BOP also notes, "the average age of offenders in BOP managed facilities is 41 years and average length of sentence is 128 months. The average age of offenders in BOP facilities has increased by 8 percent over the past decade. Approximately 45 percent of offenders have multiple chronic conditions that, despite management with medications and other therapeutic interventions, will progress and may result in serious complications." On Monday April 13, 2020 a Tornado struck FCI Estill, a medium security Federal Prison located in South Carolina requiring the movement of over 1000 inmates into other institution's increasing the already overcrowding conditions that existed and enhancing the danger to both staff and inmates of COVID-19.

There is a major concern that coronavirus disease 2019 (COVID-19) could quickly spread among federal prisoners and prison staff because of the nature of the prison environment. As this Court knows, Prisons are places where hundreds of prisoners and staff are living and working in close proximity to each other and where they are forced to have regular contact. Prisons are generally not conducive to social distancing. Also, prison infirmaries typically do not have the resources available to most hospitals, such as isolation beds, that would help prevent the spread of the disease. There are also concerns that if prison staff were hard hit by COVID-19, a significant

number of staff would require quarantine; they would be unavailable to perform their duties, including providing care to sick prisoners; and the disease could spread.

On March 13, 2020, the Bureau of Prisons (BOP) released a COVID-19 action plan. The action plan largely focuses on restricting access to federal prisons and limiting the movement of prisoners between prisons.

On March 18, 2020 the American Civil Liberties Union (ACLU) sent a letter to the Department of Justice (DOJ) and its BOP seeking the release of prisoners in the custody of BOP and the U.S. Marshals Service (USMS) who might be at risk for serious illness because of COVID-19, and a reduction in the intake of new prisoners to avoid overcrowding. In addition, multiple Members of Congress have also urged DOJ and BOP to take steps "to reduce the incarcerated population and guard against potential exposure to coronavirus," and legislation has been introduced that would require the release of some federal prisoners during a national emergency relating to a communicable disease.

BOP updated its action plan on March 19, 2020, to clarify that while prisoner movement is limited under the plan, BOP will still move prisoners as needed to properly manage the prison population and to outline new conditions that must be met if a prisoner is transferred. On March 31, 2020, BOP announced that effective April 1, 2020, all prisoners will be placed on a 14-day lockdown in their assigned cells as a measure to prevent the spread of COVID-19. Prisoners will be allowed to leave their cells during this period for certain reasons, such as attending programming or to shower and use the phone.

On April 14, 2020, BOP announced that its action plan, which was initially set to expire on April 12, 2020, would be extended until May 18, 2020.

With respect to the release of federal prisoners who are currently serving their court-imposed sentences, 18 U.S.C. Section 3582(c)(1)(A) permits a federal court to reduce a prisoner's sentence and impose a term of probation or supervised release if the court finds that "extraordinary and compelling reasons warrant such a reduction." Petitioner believes that such extraordinary and

compelling reasons exist in the case sub judice and begs this Honorable Court to modify his sentence, placing Petitioner in Home Confinement with GPS monitoring which Petitioner can help to cover the cost of. Petitioner is a first time non-violent offender he poses no threat to society and is truly contrite for his poor choices that landed him before this Honorable Court.

Respectfully presented this 13 day of May 2020.

Mr. David Wikel, pro-se
Reg. No. 19621104
MDC GUAYNABO
METROPOLITAN DETENTION CENTER
P.O. BOX 2005
CATANO, PR 00963